**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 1-25-cv-25202-GALYES/SHAW-WILDER**

**JOHN DOE #1, JOHN DOE #2, JOHN DOE #3,** and **JANE DOE**, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

**CURALEAF, INC.**,

Defendant.
_______________________________________/

**PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS**

# TABLE OF CONTENTS


Page

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

ARGUMENT ............................................................................................................ 3

**I. PLAINTIFFS STATE A CLAIM UNDER THE WIRETAP ACT** ........................... 3

**A. The Intercepted Information Revealed the "Contents" of Communications** .. 3

**B. Defendant's Status as a Party to Communications is Irrelevant** ...................... 7

**C. Plaintiffs Establish the Crime-Tort Exception** .................................................. 7

**II. PLAINTIFFS STATE A CLAIM UNDER THE FSCA** .......................................... 12

**III. PLAINTIFFS STATE A CLAIM FOR CIVIL THEFT** ......................................... 14

**IV. PLAINTIFFS STATE A CLAIM UNDER THE FDUTPA** .................................... 16

**V. PLAINTIFFS STATE A CLAIM FOR INTRUSION UPON SECLUSION** ......... 17

CONCLUSION ......................................................................................................... 18

## **INTRODUCTION**

Defendant operates an online pharmacy that allows patients to order and purchase medical marijuana. As evinced by numerous statutes, industry standards, and representations on Defendant's website, Plaintiffs possessed a reasonable expectation of privacy when purchasing medical marijuana. Despite that reasonable expectation of privacy, Defendant disclosed protected information to numerous third parties—including Google and other digital marketing companies—through code on its website that contemporaneously intercepted Plaintiffs' communications. By doing so, Defendant violated federal and state anti-wiretapping laws.

Defendant's attempt to dismiss these claims are meritless. Multiple courts in this Circuit—including a recent decision from the Southern District of Florida—have reviewed substantively identical allegations and held that they give rise to claims under anti-wiretapping laws. *See Cobbs v. Petmeds Express, Inc.*, --- F. Supp. 3d ---, 2026 WL 905375, (S.D. Fla. Jan. 14, 2026); *see also W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *1 (M.D. Fla. Mar. 6, 2025); *D.S. v. Tallahassee Memorial Healthcare*, 2024 WL 2318621, at *1 (N.D. Fla. May 22, 2025); *see also Doe v. Wellstar Health Systems, Inc.*, 799 F. Supp. 3d 1268, 1279 (N.D. Ga. 2025).

Moreover, a court in the Northern District of California has already rejected nearly all of Defendant's arguments after reviewing substantively similar allegations. *See Smith v. Rack Room Shoes, Inc.*, 2025 WL 1085169 (N.D. Cal. Apr. 4, 2025) ("*Smith I*"); *Smith v. Rack Room Shoes, Inc.*, 2025 WL 221002 (N.D. Cal. Aug. 8, 2025) ("*Smith II*").

These decisions are far from outliers. Indeed, courts from across the country have routinely rejected Defendant's arguments. *See, e.g.*, *Stein v. Edward-Elmurst Health*, 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025) (collecting cases). The same result should be reached here.

## BACKGROUND

Defendant Curaleaf, Inc., "owns and operates www.curaleaf.com, one of the largest online pharmacies for medical marijuana." *See* ECF No. 23, First Amended Complaint ("FAC") ¶ 2. As a licensed medical marijuana treatment center, "[n]umerous federal and state laws impose a legal obligation on Defendant to keep protect[ed] health information about marijuana usage and consumption—including details about marijuana treatments or prescriptions—strictly confidential." *See id.* ¶ 3; *see also id.* ¶¶ 24–39. Along with those legal obligations, "[t]he industry standard is to treat information concerning medical cannabis treatment and usage as confidential." *See id.* ¶ 38. And yet, despite these statutory requirements and industry standards, Defendant "systematically discloses such information to numerous third parties," including "Google, Inc. ('Google'), SD Technologies, Inc., ('Sweed'), InRadio, Inc., ('AdPredictive'), and StackAdapt Inc. ('StackAdapt')." *See id.* ¶¶ 4, 40. To do so, Defendant integrated code from those third parties into its website that "contemporaneously intercepts electronic communications." *See id.* ¶¶ 42, 44–45, 54, 59–61, 67–69, 102, 118.

Plaintiffs are patients who "visited curaleaf.com and purchased medicinal marijuana." *See id.* ¶¶ 7–10. While doing so, they "visited webpages and clicked on buttons revealing the medicinal products that [they] intended to purchase." *Id.* "After adding [their] medication to [their] cart," Plaintiffs "navigated to the checkout page and entered [their] full name[s], phone number[s], email address[es], and billing address[es]." *See id.* "Although unaware at the time," Plaintiffs are "informed and believe[] that Defendant assisted third parties—including but not limited to Google, Sweed, AdPredictive and StackAdapt—with intercepting [their] electronic communications," including "communications that contained protected health information and personally identifiable information." *See id.*

"By assisting third parties intercepting sensitive and confidential communications, Defendant violated state and federal anti-wiretapping laws—along with HIPAA and other state laws prohibiting a marijuana treatment center from disclosing such information." *See id.* ¶ 5.

## ARGUMENT

### I. PLAINTIFFS STATE A CLAIM UNDER THE WIRETAP ACT

#### A. The Intercepted Information Revealed the "Contents" of Communications

Defendant argues that Plaintiffs fail to allege "that Curaleaf intercepted or procured another person to intercept 'the contents of' [their] communications." *See* MTD at 5. That argument disregards Plaintiffs' allegations demonstrating that four types of information—form field entries, the text of buttons clicked, full-string URLs, and products viewed and purchased—revealed the "contents" of their electronic communications. *See* FAC ¶ 105; *see also id.* ¶¶ 45, 54, 62, 70.

"To state a claim under the Wiretap Act, a plaintiff must show that the defendant (1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication (5) using a device." *See Perez v. Hadley*, 2026 WL 500627, at *8 (S.D. Fla. Feb. 6, 2026) (internal quotations omitted). The term "electronic communication" means "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photoopitcal system that affects interstate or foreign commerce." *See* 18 U.S.C. § 2510(12). The term "contents," in turn, "includes any information concerning the substance, purport, or meaning of that communication." *See* 18 U.S.C. § 2510(8). The distinction between the content of communications and non-content information—also known as record information—"looms large in federal surveillance law." *See In re Google Inc. Cookie Placement Cons. Priv. Litig.*, 806 F. 3d 126, 136 (3d Cir. 2015). Although they are "not mutually

exclusive categories," *id.* at 139, the term "contents" generally refers to "the intended message conveyed by the communication." *See In re Zynga Priv. Litig.*, 750 F. 3d 1098, 1106 (9th Cir. 2014). By contrast, record information generally refers to "dialing, routing, addressing or signaling information." *See In re Google*, 806 F. 3d at 135. "For instance, information about a telephone call's origination, length and time have been found to be non-content record information." *Cobbs*, 2026 WL 905375, at *7 (quotations omitted).

Plaintiffs allege that Defendant assisted third parties with intercepting the following information: "1) form-field entries; 2) full-string URLs; 3) information revealing the text of buttons clicked; and 4) information revealing the products that patients browsed, added to [their] cart, or purchased." *See* FAC ¶ 105; *see also id.* ¶¶ 45, 54, 62, 70. All four types of information revealed the "contents" of their communications.

Starting with the most obvious, words that consumers manually type and send on the internet constitute an "electronic communication," and information revealing the message conveyed—even when that message concerns contact information—reveals the "contents" of that communication. *See e.g.*, *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. ed 778, 795 (N.D. Cal. 2022) ("[C]ontact information provided as part of a sign-up process constitutes 'content' because this information is the subject of the communication."); *see also In re Pharmatrak, Inc.*, 329 F. 3d 9, 18 (1st Cir. 2003) (Transmission of completed online forms … constitute electronic communications.").

The same holds true for information revealing "the name of the button clicked." *See In re Pixel Healthcare Litig.*, 647 F. Supp. 3d at 795. By way of analogy, consider a person who drafts and transmits a text message by pressing buttons on a cell phone; that message—once the send button is clicked—indisputably constitutes an "electronic communication," and its "substance" is

protected from interception. *See, e.g.*, 18 U.S.C. § 2510(10)–(11). Similarly, a button on a website labeled "add to cart," once clicked, is on the same footing as a text message, once sent, containing identical words; the only difference is the number of buttons clicked to convey the same communication. *See generally Lamonaco v. Experian Info. Solutions., Inc.*, 141 F. 4th 1343, 1347 (11th Cir. 2025) (noting consumers can communicate "assent to terms" by "click[ing] a 'submit' button"); *see also Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1052 (S.D. Cal. 2023) ("Information about particular activity conducted and search terms used on an app qualify as the 'contents' of communication.").

The last two categories of information—"full-string URLs" and "information revealing the products that patients browsed, added to [their] cart, or purchased"—also disclosed the content of Plaintiffs' communications. *See, e.g.*, FAC ¶¶ 45–46, 62. To be sure, unlike button clicks and form-field entries, URLs can serve "a routing function," thereby qualifying as record information. *See In re Google Inc.*, 806 F. 3d at 137. But they can also reveal the "contents" of communications where, as here, they "contain folder and file names' or disclose "search terms." *See Katz-Lacabe v. Oracle America, Inc.*, 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023) (finding that "full-string detailed URLs that might contain folder and file names" or URLs that reveal "search terms" can reveal "contents of communications"); *see generally In re. Google Inc.*, 806 F. 3d 125 (noting the "functional parallels" between "highly detailed URLs" and "post-cut-through digits"); *see also Doe v. Eating Recovery Center LLC*, 806 F. Supp. 3d 1109, 1116 (N.D. Cal. 2025) (noting that "[s]everal courts have held that detailed URLs that reveal the specific document, product, or service that a user is viewing content as contents of communications") (collecting cases).

Defendant's counterarguments are unpersuasive. Defendant argues, for example, that "routine identifying information, including the website user's name and shipping and billing

address information, do not constitute 'contents' of a communication under the Wiretap Act." *See* MTD at 6. To be sure, "personally identifiable information **that is automatically generated by the communication … is not covered.**" *See In re iPhone*, 844 F. Supp. at 1062 (emphasis added). But as courts routinely recognize, "record information may constitute 'contents' where the record is the subject of a communication." *See Price Carnival Corp.*,712 F. Supp. 3d 1347, 1360 (S.D. Cal. 2024) (quotations omitted). In other words:

> Whether information is "content" or "record information" can depend in part on the manner in which the information is generated, as information that would otherwise be considered "record information"—such as names, addresses, telephone numbers, and email addresses—may be "contents" of a communication where the user communicates with a website by entering this information into a form provided by the website.

*Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 517 (C.D. Cal. 2021); *see also In re Google*, 806 F. 3d at 137 ("If an address, phone number, or URL is … part of the substantive information conveyed to the recipient, then by definition it is 'content.'"); *In re Zynga*, 750 F. 3d at 1107 (noting that "contents" includes inputting information—like, for example, "email addresses" and "telephone numbers"—"into a form provided by a website"); *In re Pharmatrak*, 239 F. 3d at 16 (finding the "contents" of communications" include "personal information entered into an online form").

With respect to information revealing the text of buttons clicked, Defendant concedes that "the words of a text message" reveal the contents of a communication. *See* MTD at 7. Defendant declines to explain, however, how or why the Wiretap Act would treat a text message and a button conveying the same communication—like, for example, "add to cart" or "submit"—differently. That is because there is neither a technical nor linguistic reason for making such a distinction.

Defendant also argues that "URLs that contain only basic identification and website address information—but not information like search terms—do not constitute 'contents' under

the Wiretap Act." MTD at 6. To be sure, "the domain name portion of the URL—everything before the '.com'—instructs a centralized web server to direct the user to a particular website, but the post-domain name portions of the URL are designed to communicate to the visited website which webpage content to send the user." *See In re Google*, 806 F. 3d at 140. As a corollary, where, as here, the "post-domain name portions" reveal the content that was requested, the URLs also reveal the content of that communication. *See In re Google*, 805 F. 3d at 139 (analogizing to "post-cut-through digits in the telephone context"); *Cobbs*, 2026 WL 905375, at *6 (holding "that Plaintiffs' form entries, text of buttons clicked, and full string URL's reveal[ed] the 'substance,' 'purport,' and/or 'meaning' of their communications").

Plaintiffs thus properly allege that Defendant assisted third parties—*i.e.*, Google, Sweed, AdPredictive, and StackAdapt—with intercepting the "content" of their electronic communications. *See, e.g.*, *id.*; *see also Smith I*, 2025 WL 1085169, at *4 (reviewing substantively identical allegations and finding the plaintiffs adequately alleged that "their URLs, button clicks, and viewing and cart history" revealed the "content" of their electronic communications).

**B. Defendant's Status as a Party to Communications is Irrelevant**

Defendant asserts that "Curaleaf cannot, as a matter of law, be liable under the Wiretap Act for the alleged interception of communications to which Curaleaf was a party." *See* MTD at 8. That is wrong. To be sure, Plaintiffs agree that Curaleaf was "a party to their allegedly intercepted communications." *See* MTD at 8. Indeed, Plaintiffs' allegations would make little sense otherwise. But the analysis does not end there; Plaintiffs establish their claim under the Wiretap Act by properly invoking the crime-tort exception.

**C. Plaintiffs Establish the Crime-Tort Exception**

Defendant contends that "Plaintiffs cannot plausibly allege that Curaleaf had a criminal or

tortious purpose separate and independent from the alleged procurement of the interception." *See* MTD at 8. Plaintiffs plead precisely as much, and Defendant's decision to misconstrue those allegations is both telling and dispositive.

Where a person or entity is "a party to the communication" or "has given prior consent" to the alleged interception, the Wiretap Act "can only be violated … if the interception was 'for the purpose of committing any criminal or tortious act.'" *See Lucas v. Fox News Network, LLC*, 248 F. 3d 1180, 1180 (11th Cir. 2001) (quoting 18 U.S.C. § 2511(2)(d)). In other words, even when the interception involves a participant to the communication, an interception remains actionable under the Wiretap Act "when done for the purpose of facilitating some further impropriety." *See Planned Parenthood Federation of America, Inc. v. Newman*, 51 F. 4th 1125, 1135 (9th Cir. 2022) (quotations omitted). That analysis turns "not upon whether the interception itself violated another law," but "upon whether the purpose for the interception—its intended use—was criminal or tortious." *See Sussman v. American Broadcasting Co.*, 186 F. 3d 1200, 1202 (9th Cir. 1999).

Plaintiffs establish the crime-tort exception. As alleged, "Defendant and the third parties—including but not limited to Google, Sweed, AdPredictive and StackAdapt—intercepted Plaintiffs' and Class members' electronic communications for unlawful and tortious purposes." *See* FAC ¶ 107. "Those purposes include": 1) "associating the content of electronic communications with preexisting consumer profiles"; 2) "violating HIPAA and state law by disclosing protected health information to run targeted advertisements and marketing campaigns"; and 3) "aiding and abetting third parties—including but not limited to Google, Sweed, AdPredictive and StackAdapt—with using protected health information and personally identifiable information in a manner that violates state privacy laws, including those that mandate protecting 'personal identification numbers' and 'medical records.'" *Id.* (quoting Fla. Stat. § 817.011); *see also* ¶ 3 (citing Fla. Stat.

§ 381.986 and Fla. Stat. § 817.568 for the proposition that "state laws impose a legal obligation" to protect "health information about marijuana usage and consumption").

As courts in this District and elsewhere have repeatedly held, all three purposes satisfy the crime-tort exception. *See Cobbs*, 2026 WL 905375, at *5 (reviewing substantively identical allegations and finding that the consumers adequately alleged the crime-tort exception "given Plaintiffs' allegations that Defendant and the third parties knowingly intercepted Plaintiffs' electronic communications without Plaintiffs' counsel to exploit the confidential communications for targeted advertisements and direct marketing, in violation of state privacy laws") (internal quotations omitted); *W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *7 (M.D. Fla. Mar. 6, 2025) (finding the crime-tort exception satisfied where the plaintiff "allege[d] that Defendant intercepted the contents of her communications for the purpose of violating the FSCA and HIPAA"); *Stein*, 2025 WL 580556, at *4 (noting that "[c]ourts from coast to coast have recognized that a violation of HIPAA can give rise to the crime-tort exception"); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021) ("The association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies this exception.").

Defendant's counterarguments are unavailing. Defendant asserts, for example, that "Curaleaf is not a 'covered entity' under HIPAA." *See* MTD at 11. As an initial matter, Defendant has publicly recognized the opposite, publishing a "Notice of Privacy Practices" that "describ[es] how Curaleaf purports to protect health information 'consistent with the requirements of the Health Insurance Portability and Accountability Act ('HIPAA') Privacy Rule.'" *See* FAC ¶ 39.

In any event, Defendant's argument rests on the proposition that it never engaged in a "transaction." But as defined by the Department of Health and Human Services, "[t]he term 'transaction' means the transmission of information between two parties to carry out financial or

administrative activities related to health care." *See* 45 C.F.R. § 160.103. That "includes," for example, "[h]ealth care payment and remittance advice." *Id.* The term "health care," in turn, means "care, services, or supplies related to the health of an individual," *see id.*, and the term "payment" means "[b]illing, claims management, … and related health care data processing." *See* 45 C.F.R. § 164.501. As a medical marijuana treatment center, Defendant indisputably uses its website to "bill[]" patients for "services … related to the health of an individual." *See* 45 C.F.R. § 160.103; 45 C.F.R. § 164.501. But through misplaced reliance on the definition for "health care electronic funds transfer (EFT) and remittance advice transaction," Defendant disagrees with that conclusion, contending that "cannabis products are not covered by health plans and therefore Plaintiffs do not and cannot allege that Curaleaf is transmitting payments or information to health plans." *See* MTD at 10–11. That argument is fatally flawed for three reasons.

*First*, Defendant leaves entirely unexplained how or why the definition for "[h]ealth care payment" would mirror the definition for "health care electronic funds transfer." *See generally* MTD. *Second*, even if that interpretation were somehow correct, Defendant ignores the word "includes" within the definition for "transaction" and construes the enumerated list as exhaustive. *See* MTD at 10–11. That omission makes sense because Defendant does not—and cannot—dispute that it uses its website to "carry out financial or administrative activities related to health care." *See* C.F.R. § 160.103. And *third*, Defendant's argument relies on improperly assuming that "cannabis products are not covered by health plans." *See* MTD at 12. Those three reasons are precisely why courts have held that "[a]pplication of the crime-tort exception appears more fit for resolution at summary judgment or trial than at the motion to dismiss stage." *See Orlando Health, Inc.*, 2025 WL 722892, at *8.

Even if Curaleaf somehow fails to qualify as a "covered entity" under HIPAA, Defendant

notes but entirely ignores Plaintiffs' allegations that "state laws" also "impose a legal obligation on Defendant to keep protect[ed] health information about marijuana usage and consumption—including details marijuana treatments or prescriptions—strictly confidential." *See* FAC ¶ 3; *see also* MTD at 8. As a "medical marijuana treatment center," for example, Florida law prohibits Defendant from "disclosing personal and confidential information of a qualified patient." *See* Fla. Stat. § 381.986(10(f)(5). More generally, Florida law also prohibits "us[ing], or possess[ing] with intent to fraudulently use, personal identification information concerning another person." *See* Fla. Stat. § 817.569(2)(a). As statutorily defined, the term "personal identification information" includes "name," "electronic mail address," "[u]nique electronic identification number," "[t]elecommunication identifying information," and "medical records." Fla. Stat. § 817.569(1)(f). By ignoring Plaintiffs' allegations concerning these state laws, Defendant leaves uncontested that Curaleaf assisted third parties with intercepting the content of Plaintiffs' communications for the purpose of violating both statutes by disclosing and using "intercepted communications to guide its advertising and marketing efforts." *See* FAC ¶ 108; *see also id.* ¶¶ 3–4, 42, 53, 59, 67, 74–80.

Throughout its analysis, Defendant also suggests that any alleged "criminal or tortious purpose" was insufficiently "separate and independent" from "the alleged procurement of the interception." *See* MTD at 8. But that argument—raised cursorily at best—is wrong. Defendant concedes that the crime-tort exception focuses on the "intended use" for the intercepted communication. *See* MTD at 9. And here, Plaintiffs allege that federal and state laws independently outlaw using or disclosing those intercepted communications "to run targeted advertisements and personalized marketing campaigns." *See* FAC ¶ 108; *see also id.* ¶¶ 33; 3–5. As courts "from coast to coast" have held, these allegations satisfy the crime-tort exception. *See Stein*, 2025 WL 580556, at *6; *see also Cobbs*, 2026 WL 905375, at *7 (reviewing analogous

allegations and arriving at the same conclusion); *Orlando Health*, *Inc.*, 2025 WL 722892, at *8 (same); *Doe v. Wellstar Health Systems, Inc.*, 799 F. Supp. 3d 1268, 1280 (N.D. Ga. 2025) (same); *R.S. v. Prime Healthcare Services, Inc.*, 2025 WL 103488, at *7 (C.D. Cal. Jan. 13, 2025) (same); *Castillo v. Costco Wholesale Corp.*, 2024 WL 4785136, at *7 (W.D. Wash. Nov. 14, 2024) (same); *Cooper v. Mount Sinai Health Systems, Inc.*, 742 F. Supp. 3d 369, 383 (S.D.N.Y. 2024) (same); *In re Group Health Plan Litig.*, 709 F. Supp. 3d 707, 720 (D. Minn. 2023) (same); *Doe v. Deaconess Illinois Union County Hospital, Inc.*, 2025 WL 2771415, at *11 (S.D. Ill. Sept. 29, 2025) (same).

## II. PLAINTIFFS STATE A CLAIM UNDER THE FSCA

Turning to Plaintiffs' claim under the Florida Security of Communications Act, Defendant argues that "Plaintiffs fail to plausibly allege the interception of the 'contents' of communications." *See* MTD at 13. As an initial matter, the FSCA and the Wiretap Act define the terms "contents" and "electronic communications" substantially the same. *Compare* 18 U.S.C. § 2510(8) *and* 18 U.S.C. § 2510(12) *with* Fla. Stat. § 934.02(7) and Fla. Stat. § 934.02(12). As a corollary, the analysis concerning whether Plaintiffs satisfy that element under the Wiretap Act applies with full force here. *See Orlando Health, Inc.*, 2025 WL 722892, at *3 (M.D. Fla. Mar. 6, 2025) ("Because the FSCA was modeled after the Wiretap Act, Florida courts construe the FSCA's provisions in accord with the meaning given to analogous provisions of the Wiretap Act.").

Despite the analytical overlap, Defendant for the first time cites a string of cases from "this District and in the Middle District of Florida" that purportedly support its argument that "Plaintiffs fail to plausibly allege the interception of the 'contents' of communications." MTD at 13. But these cases are clearly distinguishable. Unlike here, all those cases concerned "session replay software." *See Jacome v. Spirit Airlines Inc.*, 2021 WL 3087860, at *2 (Fla. 17th Jud. Cir. June 17, 2021) (analyzing FSCA's application to "session replay software"); *Cardoso v. Whirlpool*,

2021 WL 2820822, at *1 (S.D. Fla. July 6, 2021) (same); *Goldstein v. Luxottica of Am., Inc.*, 2021 WL 4093295, at *2 (S.D. Fla. Aug. 23, 2021) (same); *Goldstein v. Costco Wholesale Co.*, 559 F. Supp. 3d 1318, 1320 (S.D. Fla. 2021) (same).[1]

What is more, unlike here, all those cases involved "generic commercial setting." *Orlando Health*, 2025 WL 722892, at *3; *Goldstein*, 559 F. Supp. 3d at 1320 (analyzing the use of "session replay software" on "a commercial website"); *Cardoso*, 2021 WL 2820822, at *2 (same); *Jacome*, 2021 WL 3087860, at *1 (same); *Goldstein*, 2021 WL 4093295, at *2 (same).

For these two reasons, courts reviewing analogous allegations in the Eleventh Circuit and elsewhere have routinely found these cases distinguishable. *See Orlando Health*, 2025 WL 722892, at *3 (distinguishing *Jacome* and upholding claims brought under the FSCA after reviewing analogous allegations); *see also Katz-Lacabe v. Oracle Am., Inc.*, 2023 WL 6466195, at *5 (N.D. Cal. Oct. 3, 2023); *A.D. v. Aspen Dental Management, Inc.*, 2024 WL 4119153, at *6 (N.D. Ill. Sept. 9, 2024) (same); *In re TikTok, Inc. In-App Browser Priv. Litig.*, 2024 WL 4367849, at *15 (N.D. Ill. Oct. 1, 2024) (same); *Castillo*, 2024 WL 4785136, at *10 (same).

Indeed, Defendant cites to *Goldstein v. Luxottica of America Inc.*, 2021 WL 4125357 (S.D. Fla. Sept. 9, 2021) ("*Goldstein II*"), in which Judge Cannon adopted a report and recommendation from Magistrate Judge Reinhart agreeing with *Jacome* and its progeny "that session replay software did not intercept the 'contents' of any communication." *See Goldstein v. Luxottica of America, Inc.*, 2021 WL 4093295, at *2 (S.D. Fla. Aug. 23, 2021); *Goldstein II*, 2021 WL 4125357 at *1 (finding the R&R "to be well reasoned and correct"). After reviewing nearly identical allegations as those here, however, Judge Cannon arrived at the opposite conclusion, finding that "Plaintiffs' form entries, text of buttons clicked, and full string URL's reveal[ed] the 'substance,'

[1] Session replay software, unlike the tracking technology here, "tracks a website browser's movement" to recreate a user's session on a website. *See Jacome*, 2021 WL 3087860, at *3.

'purport,' and/or 'meaning' of their communications." *See Cobbs*, 2026 WL 905375, at *4. Defendant's caselaw thus lacks persuasive value because even the courts that authored those decisions would find the facts alleged here distinguishable from session replay software.

Finally, at a minimum, the Eleventh Circuit has expressly held that individuals "can raise a question of fact regarding [the defendant's] actual interception of his conversations without proving the contents of specific conversations allegedly intercepted." *See Walker v. Darby*, 911 F. 2d 1573, 1578 (11th Cir. 1990). Accordingly, any question regarding "whether and to what extent" the intercepted information reveals the "contents" of "communications" is better left for summary judgment. *See Tallahassee Memorial HealthCare*, 2024 WL 2318621, at *1 (deferring "highly technical questions," like "whether and to what context the contents of Plaintiff's activities can be considered 'communications' for purposes of the FSCA," for summary judgment); *see also Cobbs*, 2026 WL 905375, at *7 (holding that the plaintiffs properly alleged that the intercepted communications revealed the content of communications "at least for purposes of Rule 12(b)(6)"); *Orlando Health, Inc.*, 2025 WL 722892, at *5 (same).

## III. PLAINTIFFS STATE A CLAIM FOR CIVIL THEFT

Defendant asserts that Plaintiffs fail to state a claim for civil theft because their medical records and online activity cannot qualify as "property." *See* MTD at 15. But that argument can be easily rejected. As statutorily defined, "'[p]roperty' means anything of value." *See* Fla. Stat. § 812.012. And here, the FAC expressly alleges that "Plaintiffs' and Class members' online activity—including the browsing history and purchase history generated by navigating Defendant's website—has financial value." *See* FAC ¶¶ 74–80; 130. Defendant surprisingly declines to cite—let alone address—these allegations. *See generally* MTD at 14–16. Instead, Defendant skips to challenging whether Plaintiffs have "a legally recognizable interest" in their

online activity on Defendant's website. *See id.* at 15. As previously noted, however, Defendant possessed "a statutory duty" to keep Plaintiffs' information confidential. *See Abril v. Dep't of Corrections*, 884 So. 2d 206, (Fla. 2d DCA 2004); *see also* FAC ¶¶ 3–5, 26–45, 108. Even absent an explicit statutory duty, "[m]any federal courts have held an implied contract to safeguard customers' sensitive data [can] reasonably be found to exist in transactions where consumers are solicited or invited to provide personal information in exchange for a good or service." *See In re Mednax Services, Inc.*, *Customer Data Security Breach Litig.*, 603 F. Supp. 3d 1183, 1221 (S.D. Fla. 2022). Put together, Plaintiffs plainly establish that they possessed a cognizable interest in Defendant upholding its duty—whether legal or contractual in nature—to safeguard their sensitive information from disclosure and misappropriation. *See* FAC ¶ 132–33. Plaintiffs also plainly establish that Defendant aided and abetted third parties with infringing upon that cognizable interest by helping those third parties "use" and "appropriat[e]" their sensitive and personally identifiable information. *See id.* ¶¶ 131–34; *see also id.* ¶¶ 47, 56, 64, 71. By doing so, Plaintiffs properly allege that Defendant committed civil theft. *See, e.g.*, Fla. Stat. § 771.011 ("Whoever commits any criminal offense against the state … or aids, abets, counsels, hires, or otherwise procures such offense to be committed … is a principal in the first degree[.]").

Seeking to avoid that conclusion, Defendant asserts that the intercepted communications cannot constitute "protected health information" unless they contain "medical diagnosis or condition information." *See* MTD at 15. But that argument is bizarre at best, effectively meaning that any pharmacy—whether a licensed marijuana treatment center or not—can create and disclose a list that identifies patients and reveals their medications so long as the pharmacy omits the ailments that caused those patients to receive prescriptions in the first place. There is neither a legal nor pragmatic reason for adopting such an interpretation. *See, e.g.*, 45 C.F.R. § 160.103

(defining "health information" as including "any information" that relates to "the provision of health care to an individual"); *see also* FAC ¶¶ 32–36.

Defendant ends by analogizing to decision from federal courts interpreting other state laws that require litigants to demonstrate that the alleged "property" was capable of "exclusive control." *See* MTD at 15. But unlike claims brought under those statutes, an individual bringing a civil theft claim under Florida law need only allege "that one knowingly obtain[ed] or use[d] the property of another." *See Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 501 (Fla. 3d DCA 1994). As statutorily defined, the term "obtains or uses" not only encompasses "[t]aking control or exercising control over property," but also includes "any unauthorized use" or "misappropriation." *See* Fla. Stat. § 812.012(3). And here, Plaintiffs plead precisely as much. *See* FAC ¶¶ 133–34.

## IV. PLAINTIFFS STATE A CLAIM UNDER THE FDUTPA

Defendant argues that Plaintiffs fail to allege a "deceptive or unfair practice." *See* MTD at 16. That is wrong. As the Florida Supreme Court has recognized, "[a]n unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *See PNR, Inc. v. Beacon Property Management, Inc.*¸ 842 So. 2d 773, 777 (Fla. 2003). Moreover, in enacting FDUTPA, the Florida Legislature specified that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), as of July 1, 2017." *See* Fla. Stat. § 501.204(2). As alleged, "[t]he FTC has made clear that disclosing consumers' health information for advertising without their affirmative express [consent] may be an unfair practice." *See* FAC ¶ 143. What is more, under both state and federal law, "Defendant was obligated to protect Plaintiffs and Class members' information—including but not limited to their health information, personally identifiable information, and

online activity—from disclosure." *See id.* ¶ 144. Plaintiffs thus properly allege that "Defendant engaged in unfair and practice practices by integrating tracking technologies into its website that disclosed Plaintiffs' and Class members' information—including their health information, personally identifiable information, and online activity—to Google, Sweed, AdPredictive, and StackAdapt." *Id.* ¶ 145; *Gracey v. Eaker*, 837 So. 2d 348, 351 (Fla. 2002) (noting the "stated public policy and statutory structure of protection for certain confidential relationships").[2]

## V. PLAINTIFFS STATE A CLAIM FOR INTRUSION UPON SECLUSION

Defendant asserts that "Plaintiffs allege—at most—intrusion upon private activities, not a private place, and thus fail to plausibly allege a claim for intrusion upon seclusion." *See* MTD at 20. To be sure, Florida courts require an intrusion "into a 'place' in which there is a reasonable expectation of privacy." *See Allstate Ins. v. Ginsberg*, 863 So. 2d 156, 163 (Fla. 2003). But as Florida decisions make clear, Defendant's website can constitute such a "place" in which Plaintiffs and class members can reasonably expect that their communications would remain confidential.

In 1981, the Fourth DCA noted in *Loft v. Fuller*, 408 So. 2d 619 (Fla. 4th DCA 1981) that "Florida decisions have filled out the contours of th[e] tort right of privacy by accepting the following four general categories recognized by Prosser in his Law of Torts, p. 804–14 (4th Ed. 1971): (1) Intrusion, i.e., invading plaintiffs' physical solitude or seclusion; (2) Public Disclosure of Private Facts; (3) False Light in the Public Eye, … and (4) Appropriation." *Id.* at 622. In 1996, the Florida Supreme Court "set forth what was included within the common law tort of invasion

[2] Plaintiffs concede that their pleadings, as currently drafted, fail to adequately support their claim for "actual damages." *See Casa Dimitri Corp. v. Invicta Watch Co. of America, Inc.*, 270 F. Supp. 3d 1340, 1352 (S.D. Fla. 2017) (noting that "actual damages" under FDUTPA is "a term of art" that "does not include consequential damages") (quotations omitted). Notwithstanding that, Plaintiffs continue to seek injunctive relief as redress for to their FDUTPA claim. *See Farmer v. Humana, Inc.*, 582 F. Supp. 3d 1176, 1190 (M.D. Fla. 2022) ("In the absence of actual damages, the FDUTPA permits any aggrieved party to pursue injunctive relief.") (quotations omitted).

of privacy, adopting the four categories which had been set forth in 1980 [sic] by the Fourth District Court of Appeal's decision in *Loft.*" *Allstate Ins. v. Ginsberg*, 863 So. 2d 156, 162 (Fla. 2003). In arriving at that conclusion, the Florida Supreme Court directly quoted the excerpt in *Loft* referencing "Prosser in his Law of Torts," pages "804–14." *See id.*[3] What is more, the Florida Supreme Court expressly referenced and relied on *The Law of Torts* when concluding that intrusion upon seclusion failed to extend to sexual harassment. *See id.* at n. 3. As recognized by Prosser, intrusion upon seclusion "[has] been carried beyond such physical intrusion, and extended to eavesdropping upon private conversations by means of wire tapping and microphones." *See* Prosser, The Law of Torts, 808 (4th ed. 1971).[4] As a corollary, because Florida courts have adopted Prosser's definition for intrusion upon seclusion, the phrase "electronically intruding into one's private quarters" includes eavesdropping or wiretapping on a private conversation. *See Allstate Ins.*, 863 So. 2d at 162. Accordingly, to the extent that Florida courts require an intrusion into a "place," Plaintiffs properly allege that "Defendant's website constitutes a private place because Curaleaf possessed statutory obligations to ensure that patients' communications would remain confidential." FAC ¶ 150.

## CONCLUSION

Defendant's motion to dismiss should be denied in full.[5]

[3] The Florida Supreme Court also relied on *Agency for Health Care Admin v. Assoc. Indus. Of Florida, Inc.*, 678 So. 2d 1239, 1252 (Fla. 1996), which quoted a concurrence from Justice Overton in *Forsberg v. Housing Auth. Of Miami Beach*, 455 So. 2d 373, 376 (Fla. 1984) that—just like the Fourth DCA in *Loft*—derived its formulation from Prosser, the Law of Torts, pages 802–814. *See Forsberg*, 455 So. 2d at 376 (Overton, J., concurring).

[4] Publicly available at https://archive.org/details/handbookoflawoft00pros/page/808/mode/2up.

[5] To the extent the Court determines otherwise, Plaintiffs respectfully request leave to amend. *See, e.g.*, *Cibran Enterprises, Inc. v. BP Products North America, Inc.*, 365 F. Supp. 2d 1241, 1251 (S.D. Fla. 2005) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be freely given.") (quotations omitted).

Dated: April 6, 2026

Respectfully submitted,

MARCUS RASHBAUM PINEIRO & MEYER LLP
By: ***Christopher R. Reilly, Esq***.

Christopher R. Reilly
Florida Bar No. 1025097
creilly@mrpfirm.com
Michael A. Pineiro, Esq.
Florida Bar No. 41897
mpineiro@mrpfirm.com
One Biscayne Tower
2 S. Biscayne Blvd., Ste. 2530
Miami, Florida 33131
Telephone: (305) 400-4260

*Attorneys for Plaintiffs*